| DISTRICT COURT OF THE VIRGIN ISLANDS |
| :---: |
| DIVISION OF ST. CROIX |

KATHERINE WILLETT,

      Plaintiff/Counter-Defendant,

      v.

CHRISTOPHER DAHLBERG,

      Defendant/Counter-Plaintiff.

_____

1:24-cv-00024-MEM-EAH

TO:    Lee J. Rohn, Esq.
        David J. Cattie, Esq.

## ORDER AND REPORT & RECOMMENDATION

**THIS MATTER** comes before the Court on the "Motion for Sanctions Against Katherine Willett and Attorney Lee Rohn Including Dismissal, Fees, Costs, Etc." ("Sanctions Motion") filed on April 16, 2025 by David J. Cattie, Esq., attorney for Defendant/Counter-Plaintiff Christopher Dahlberg. Dkt. No. 38. In his motion, Dahlberg seeks dismissal of the complaint as well as other forms of relief pursuant to the Court's inherent authority as a result of Plaintiff/Counter-Defendant Katherine Willett's reading of numerous emails between Dahlberg and his former counsel in a contentious divorce/domestic violence proceeding in the Superior Court of the Virgin Islands; copying one of those emails and sharing it with Attorney Lee J. Rohn, her counsel in this proceeding; and Attorney Rohn filing that email as an exhibit in support of one of Willett's motions, Dkt. No. 37-1. Willett filed an opposition to the Sanctions Motion, Dkt. No. 52, and Dahlberg filed a reply, Dkt. No. 63. The Court held an evidentiary hearing on July 29, 2025. Dkt. No. 76. Dahlberg filed his post-hearing supplemental brief on October 17, 2025, Dkt. No. 115, and Willett filed hers on November 17, 2025. Dkt. No. 120. For the reasons that follow, the Court recommends

granting the Sanctions Motion in part by assessing attorney's fees and costs against Willett, and denying the motion in part by not dismissing the complaint. The Court will order Dahlberg to file an accounting of attorney's fees and costs within ten days from the date of this order.

## BACKGROUND

### A. Amended Complaint and Answer with Counterclaims

Dahlberg removed Willett's Complaint, filed in August 2024 in Superior Court, to this Court in early October 2024 based on diversity jurisdiction. Dkt. No. 1. Dahlberg then filed a motion to dismiss for failure to state a claim, Dkt. Nos. 5, 6, after which Plaintiff filed an Amended Complaint on October 22, 2024, Dkt. No. 7. She alleged that, on numerous occasions, Dahlberg "pushed, hit, threatened and held Plaintiff down to the ground" which caused a spinal injury requiring multiple surgeries. *Id*. ¶ 5. As a result of his actions, Willett incurred damages including medical expenses, permanent injuries, post-traumatic stress disorder, chronic pain, loss of income, and economic losses. *Id.* ¶ 11. She alleged claims for assault (Count I); trespass (Count II); intentional infliction of emotional distress (Count III); false imprisonment (Count IV); trespass to chattels (Count V); conversion (Count VI); and battery (Count VII). *Id*. at 4-5.

In November 2024, Dahlberg filed an answer and counterclaims. Dkt. No. 9. He alleged that the parties had been married from June 2009 until the Superior Court dissolved their marriage in February 2024. *Id.* ¶ 6. Willett—a licensed medical provider—has experienced mental and psychological issues for years, including bipolar disorder, and admitted to

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 3

Dahlberg, inter alia, that she lied on her Virgin Islands medical license application. *Id.* ¶¶ 8-21. Further, Willett stole $19,000 from his bank account and refused to return the funds. *Id.* ¶¶ 40-41. Irate that their children "fled" to live with Dahlberg, Willett sought to file false claims against him. *Id.* ¶ 48. Dahlberg alleged counterclaims for abuse of process (Count I); conversion (Count II); and intentional infliction of emotional distress (Count III). *Id.* at 8-10. Willett answered the counterclaims. Dkt. No. 17.

The parties litigated the terms of a protective order. Dkt. No. 29, 35. On April 10, 2025, Attorney Rohn filed a Notice of Filing an Exhibit in Support of Willett's Motion for a Protective Order. Dkt. No. 37. The exhibit was an email from Dahlberg to Lydia Moolenaar, Esq., Dahlberg's then-attorney in the Superior Court divorce and domestic violence proceedings that allegedly went to Dahlberg's "motive." *Id.* The email read:

> Christopher Dahlberg                    10/26/22
> TO: Moolenaarlaw@outlook.com
> RE: Domestic Violence Hearing
>
> *** Attorney Client Privilege ***
>
> Attorney Moolenaar,
>
> Please find attached, my recount of the events on October 13, 2022. Also, Katie is bipolar type 2, diagnosed in 2016. She is frequently not compliant with her medications. She has falsified all of her medical license applications. I do not want this public as it would prevent her from ever working as a doctor again. This would negatively affect the kids, her and I. This is the "nuclear option." I want you to know this. Please do not bring it up though, I must agree before it is brought up. She also may not be in a level state of mind, either very depressed or very manic.
>
> Best Regards,
> Chris

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 4

Dkt. No. 37 at 3 (the "10/26/22 email").

### B. The Sanctions Motion

On April 16, 2025, Dahlberg filed the instant Sanctions Motion. In his notice of motion, he sought numerous forms of relief pursuant to the Court's inherent authority, including an order directing that communications between Willett and Attorney Rohn (and her office) were discoverable and not privileged based on the crime-fraud exception, and an order striking the Notice, Dkt. Nos. 37, 37-1 from the record, recommending dismissal with prejudice of all claims, and granting fees and costs associated with this litigation. Dkt. No. 38. Attorney Cattie attached to the memorandum emails he sent to Attorney Rohn asking why she published the October 2022 email on the docket. Attorney Rohn responded: "Because your client gave my client access to it." Dkt. No. 39-1 at 2. Attorney Cattie asked for evidence of that permission but Attorney Rohn did not provide any. Dkt. No. 39 at 2. He filed the Sanctions Motion days later.

Dahlberg argued that Attorney Rohn's and Willett's communications are no longer privileged because the "crime fraud exception" allows the attorney-client privilege to yield when communications between an attorney and client further a crime or fraud or other substantial abuses of the attorney-client relationship. *Id.* at 3. He claimed that Attorney Rohn admitted both she and her client accessed Dahlberg's confidential communications with his former attorney, and Dahlberg never authorized that access, so there was a "reasonable basis" they engaged in actions satisfying the crime-fraud exception. Thus, the crimes violated the Crime Fraud & Abuse Act (CFFA), which prohibits a person accessing a computer without

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 5

authorization and obtaining information from it, and the Stored Communications Act (SCA), which criminalizes anyone who intentionally accesses without authorization a facility through which electronic communication is provided and obtains electronic communication while in electronic storage in the system. *Id.* at 6-7. Dahlberg also referred in passing to 14 V.I.C. § 462, a Virgin Islands statute that criminalized "the acts here." *Id.* at 7. Dahlberg posits that even if Attorney Rohn and Willett did not engage in criminal behavior, the crime-fraud exception applies because accessing an adverse party's attorney-client communications constituted "misconduct fundamentally inconsistent with the basic premises of the adversary system." *Id.* He requests that all communications between Attorney Rohn and Willet be produced to ascertain the method and extent of their illegal conduct. *Id.* at 7-8. He also seeks to have Willett's claims dismissed with prejudice under the Court's inherent authority as a sanction for her conduct. *Id.* at 8. In an accompanying Affirmation, Dahlberg avers that he never authorized the disclosure of the 10/26/22 email or gave access to any communications between him and his attorney. Dkt. 39-2 ¶¶ 7, 11.

### C.  The Opposition

In her Opposition, Willett argues that the 10/26/22 email was not privileged and lost confidentiality when it was left on a phone that she was paying for, at her home, with no password protection for a year. Dkt. No. 52 at 1. Access was authorized under settled waiver principles. Without a predicate crime, the crime-fraud exception did not apply and without bad faith/prejudice, dismissal was not a remedy. *Id.* Citing her attached affirmation, Dkt. No. 52-1, Willett asserts that: Dahlberg moved out of the marital residence in October 2022; he

returned with a police escort to retrieve his things but left behind one of his phones that was still active on Willett's cell plan, protected only by the passcode the entire family shared; he never asked for the phone or enabled two-factor authentication or a secondary password for his email, and did not tell Willett or their children not to open his device or his inbox. *Id*. at 2. The phone was inactive and uncharged until July 2023 when one of their sons connected it to a charger and unlocked it with the family passcode; once on, the email application was open, requiring no additional credentials. Because Willett was "still paying for the line" she looked at the screen and scrolled through the messages in Dahlberg's inbox; she saw the 10/26/22 email referring to the ongoing divorce that contained "a threat to falsely claim she had numerous mental issues and a threat to ruin her career as a physician." *Id.,* citing Dkt. No. 52-1. She took a screenshot and printed the email; when she learned Dahlberg was making the same threats in this case, she provided a copy to her counsel, explaining how the "email had been discovered on the phone Defendant left in the house." She cancelled the phone's service in August 2023. Since Defendant abandoned the phone, it has remained in her possession. *Id.* at 2-3.

Under the reasonable precautions test that addresses inadvertent-disclosure questions, Willett contends that privilege is waived when the privilege holder fails to guard a communication's confidentiality. *Id.* at 3. Given the shared password, Dahlberg had no reasonable expectation of privacy to prevent Willett from looking at the phone's contents (citing cases where attorney-client privilege was waived). *Id.* at 4-7. The crime-fraud exception did not apply because the CFAA requires access without authorization. Defendant

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 7

shared his passcode, left the phone in the home while still logged into email, and Willett continued to pay the monthly service charges; therefore, her access to a jointly used or abandoned device was not without authorization. *Id.* at 12. Nor could Dahlberg satisfy the statute's requirement of at least $5,000 in loss, which concerns reasonable costs to investigate, respond to, or restore a computer system: Dahlberg alleged no investigative expense, remediation or aggregate loss, so the CFAA argument fails. *Id.* at 13. The SCA was similarly inapplicable: there was no unauthorized access to communications in electronic storage on a facility operated by an electronic communications service: once a user opens a message, it leaves electronic storage and the SCA does not apply. *Id*. at 15. Communications were on a personal handset, not a third-party server, and the phone was not a statutory "facility." *Id*. at 15-16. Dahlberg waived his conclusory argument under the Virgin Islands criminal. *Id.* at 16-17.

Willett further argued that the Third Circuit examines dismissal under the factors in *Poulis v. State Farm Fire & Cas. Co.,* 747 F.2d 863 (3d Cir. 1984), and Dahlberg failed to establish prejudice and bad faith on the part of Willett. *Id.* at 18-19. There was no evidence counsel engaged in deceptive practices that undermined the integrity of judicial proceedings to warrant dismissal. *Id.* at 19. Dahlberg's cases show egregious conduct that was not the case here and the Court, if it finds any impropriety, should consider proportional and targeted sanctions, such as exclusion of the single image or a monetary penalty. *Id.* at 19-21.

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 8

### D. Dahlberg's Reply

Dahlberg points out that the crux of Willett's argument—she stole only one unprivileged email—was false because Willett reviewed numerous emails between him and his attorney, and that did not excuse Willett's conduct in stealing the communications. Dkt. No. 63 at 1. Willett admitted that in July 2023 she read all of Dahlberg's emails going back to at least October 2022; he suggests that there is no way to cure these acts other than finding that the crime-fraud exception applies. *Id*. at 1-2. Willett's justification that the email contained a threat against her was an ex post facto excuse. *Id.* at 4.

Dahlberg reiterates that he did not disclose the privileged communications to a third party and did not waive the privilege by some affirmative act, and Willett cannot claim a right to access Dahlberg's personal email account, particularly when she was in the midst of contentious litigation against him. *Id*. at 5-6. He asserts that he did not share his email or passwords with his children or Willett, and changed his password to include Two-Factor Authentication before Willett accessed his account. *Id*. at 6-9 (citing his attached affirmation, Dkt. 63-1 ¶¶ 6, 7, 10 averring that he changed his password and instituted Two-Factor Authentication for his devices before moving out of the house in 2022). He took reasonable steps to protect the privilege. *Id*. at 9. He also did not abandon the phone: he came to the marital home with a police escort, Willett gave him a trash bag of his belongings; he asked for additional items and Willett denied there were any. *Id*. But she withheld the phone and used it to steal money from his bank account and peruse his confidential email. *Id.*

Dahlberg argues the inherent power of the court should be used to dismiss the complaint because it was inappropriate for Willett to surreptitiously monitor and acquire internal documents before litigation takes place and use the document as evidence in that litigation. *Id.* at 11 (quoting *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1315 (D. Utah 2016)). *Id.* He reiterates that the crime-fraud exception requires disclosure of all emails between Attorney Rohn and Willett. *Id.* at 12-15. He asserts that Willett's proposed sanction (to preclude her from using the stolen communication in this litigation) is no sanction at all. The breadth of her misdeeds will never be known, although her affirmation indicates that she accessed and reviewed nearly 300 privileged emails relating to legal strategy between attorney and client, and seems to concede that this behavior continued into 2024. *Id.* at 17. She may have pilfered emails between Dahlberg and Attorney Cattie as well, and dismissal is the only sanction to remedy Willett's bad faith and malfeasance. *Id.* at 17-20 (citing cases).

### E.  The Hearing

The Court held a hearing on Dahlberg's motion on July 29, 2025. Dkt. No. 113 (transcript). At the hearing, both Willett and Dahlberg testified.

Willett testified that she filed a verified complaint for divorce on October 26, 2022 and two domestic violence complaints dated October 15, 2022 and November 2, 2022, based partially on her allegation that Dahlberg had assaulted her on October 2, 2022. Dkt. No. 113 at 8, 16.  He never lived in the marital home after October 15, 2022. *Id.* at 16.

She could not remember which of her young sons brought her the cellphone in July or August 2023; the child had found the phone somewhere in the house and already

unlocked it. *Id.* at 22, 63. She entered the phone passcode, *id.* at 64. She stated that the family routinely shared the passwords for cellphones. *Id.* at 38. She clicked on the email app, and realized it was Dahlberg's Gmail account when she first opened it. *Id.* at 64, 68. She started scrolling through his emails, "looking for anything that could haunt" her, and admitted she was looking for emails between Dahlberg and his then attorney, Lydia Moolenaar. *Id.* at 70. Her purpose for accessing those emails was "curiosity," *id.* at 68, 167, to "see what was in there," *id*. at 159. She could not recall how many emails between Dahlberg and Moolenaar she read. *Id.* at 25.

As to the 10/26/22 email, Willett stated that, despite having the words "Attorney Client Privilege" at the top, it concerned the domestic violence hearing in a case she was involved in and she read it anyway. *Id.* at 24-25, 27. She airdropped that email, *id.* at 22-23, and printed it out. She read other emails between Dahlberg and his attorney without having obtained permission to review his attorney-client privileged communications; she stated she would have been offended if Dahlberg had read her communications to her attorney. *Id.* at 25-26. Asked whether she had printed any other emails between Dahlberg and his attorney, Willett first said she did not recall, *id*. at 29, but then agreed that if she had found other emails regarding her case, she would have printed them out, *id*. When asked whether she had ever destroyed any emails from Dahlberg's account that she had printed, Willett could not specifically recall but she stated she went through the files she had at her house prior to the hearing and there was nothing. *Id*. Asked if she had thrown those printed emails out, she said she did not specifically recall, but it would make sense that she threw them out because they

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 11

were "not in my home." *Id.* She recalled that the thrown out emails largely dealt with financial issues such as child support. *Id.* at 71. She did not tell anyone, including her then attorney, that she was going through Dahlberg's emails because "I just like to keep my private business private." *Id.* at 34.

Willett kept the cellphone at issue because all of her children's baby photographs were stored in it and she did not want to lose them. *Id.* at 36. She gave Attorney Rohn the phone in early 2025. *Id.* at 35. Asked whether she reviewed any emails between Attorney Cattie and Dahlberg, Willett responded "never" because she "no longer had the phone" and "was not interested" in being contentious any longer. *Id.* at 28. Asked how many times she went through Dahlberg's emails after the first time she accessed the phone, Willett responded that she cancelled the cellphone service on August 14, 2023 and did not access the phone since. *Id.* at 30; *see id.* at 171-72.

Attorney Cattie asked Willett a series of questions concerning Defendant's Exhibit 13, Dahlberg's Truist Bank statement, that indicated, inter alia, that "Katie Dahlberg" had verified the account via PayPal on 12/27/23, and an $18,080 withdrawal for "St. Croix Montess" was made on 1/12/24. To all of those questions, including whether Willett accessed that Truist account from the cellphone at issue, she responded that, upon the advice of her attorney, she was "pleading the Fifth [Amendment]." *Id.* at 84-86.

On cross-examination, Willett testified that Dahlberg had given the phone passcode to her and to all of her children, *id.* at 100 and the cellphone did not have Two-Factor Authentication when she had access to it, *id.* at 115. She stated that she was under the

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 12

impression that she had free access to the phone because it belonged to her (she was paying for the account) and it was in her home, but she also knew that the Attorney Moolenaar email was not intended for her to view. *Id*. at 148-49. Upon questioning by the Court, Willett stated that she assumed that Dahlberg added Two-Factor Authentication in 2024. Asked how she would know, she responded that when she had phone in 2023 it wasn't there. *Id*. at 164-65. She also said she stopped having access to Dahlberg's emails in August 2023, as no new emails came to the phone. *Id*. at 166.

In his testimony, Dahlberg acknowledged that, while he was living at the house, his children may have used his cellphone to play games on it, but when he left in October 2022, he changed his passwords, including the one on his Gmail account; Willett's and the children's access to passcodes and emails ended when he changed all the passwords after he left. *Id*. at 208, 210, 274. He never gave Willett any authorization to review emails between himself and his attorney. *Id.* at 175. He explained how Willett could have overridden his passwords with Two-Factor Authentication, given that she had access to his cellphone number and email address. *Id*. at 178. He pointed to the 10/26/22 email and Ex. 13 showing her activity in his Truist bank account as cases in point that revealed her access. *Id.* at 186-91, 211, 216, 235, 246-48, 254-56, 263, 266, 270, 274. Dahlberg added that, between October 2022 and July/August 2023, he communicated with Attorney Moolenaar "hundreds of times" via Gmail: his "entire case" was in the emails, including discussions of the alleged assault, which was a central theme in the district court case, his recollection of what occurred, and matters he was "still working on now." *Id.* at 212-13.

When he returned to the house to retrieve his belongings, after he had left, Willett would not let him enter; he picked up his belongings that had been placed in plastic bags in her car, and she said there was nothing else. *Id.* at 176.

Dahlberg set up the Truist bank account shortly after they separated, and he never gave her authorization to access the account. She appears to have withdrawn $18,080 for a school payment. *Id.* at 177. He presumes she accessed the account through Two-Factor Authentication.[1] *Id.* at 178, 187-88, 191. Dahlberg's Dec. 2023-Jan. 2024 bank statement was admitted into evidence as Exhibit 13. *Id.* at 206. Attorney Cattie argued that it went to Willett's credibility because she had testified she stopped accessing his accounts in 2023 but she was still accessing it in late 2023 and early 2024, as shown by the Exhibit, and knew how to operate Two-Factor Authentication. *Id.* at 205-07.

### F. Post-Hearing Supplemental Briefs

In his post-hearing brief, Dahlberg asserts that the Court asked the parties to address three issues: (1) how Willett gained access to Dahlberg's emails; (2) the issue of privilege waiver (and if it had been waived at all); and (3) the appropriate remedy for Willett's misconduct. Dkt. No. 115 (citing Dkt. No. 113 at 288-91, 294-95). As to the first issue, Willett lied about Dahlberg not enabling Two-Factor Authentication for his email account until 2024; as he averred, he enabled it prior to moving out of the house in 2022. Willett also used Dahlberg's cellphone in January 2024 to bypass security protocols on his Truist bank account

---

[1] He noted on cross examination that he could not say that he changed his telephone number (for Two-Factor Authentication purposes) on his Truist account, since he had hundreds of accounts with password protection. Dkt. No. 113 at 221.

that he had opened after he moved out of the marital home. *Id*. at 3-4. Further, when one of

the sons brought her the cellphone, Willett stated she did not know to whom it belonged but,

after opening the home screen, she saw Dahlberg's Apple ID and certain applications she

knew were particular to him; she went to the settings app to confirm it was Dahlberg's phone

and when she clicked on the email account, she knew it was his account. *Id*. at 4-5. She used

his password to gain access to the phone that initial time and at other times thereafter. *Id*. at

5. Willett then accessed nine months of email communications between Dahlberg and his

attorney regarding the ongoing divorce and domestic violence litigation she was engaged in

with Dahlberg. She bypassed passwords and Two-Factor Authentication to gain access to his

accounts; but even if she had not, she still illicitly accessed his privileged communications.

*Id.* at 6. Dahlberg never waived that privilege and Willett testified that, at the point she

accessed those emails, whatever permissions he may have given her to go through his phone

and emails when they were living together "probably" did not stand. *Id*. at 6-7. Moreover, she

admitted that the 10/26/22 email that her counsel filed on the record in the instant

proceeding (regarding the domestic violence hearing that forms the basis for her claims in

this litigation) was confidential; the reason she went through the emails was "curiosity." *Id.*

at 7-8. Dahlberg contends that Willett's attempt to suggest that that "curiosity" spanned a

couple of weeks defies logic; she engaged in a "calculated plan to invade the attorney-client

relationship to obtain information for tactical purposes," and her position that she was no

longer in possession of a treasure trove of emails (given that she said she copied numerous

emails but destroyed them) was not worthy of belief. *Id.* at 9-10.

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 15

Dahlberg's communications with his prior counsel satisfied all of the elements of 5 V.I.C. § 862, setting out the elements of attorney-client privilege, in that they were made between an attorney and client, in confidence, for the purpose of obtaining or providing legal assistance for Dahlberg. *Id.* at 12-13. Willett did not prove waiver—a heavy burden—because waiver requires an affirmative act, 5 V.I.C. § 852(9), and there is no evidence that Dahlberg took any affirmative step to waive privilege, voluntarily disclosed his privileged emails, or consented to their disclosure. *Id.* at 13-14. He testified he changed his passwords in 2022; the fact that Willett circumvented his security attempts did not constitute waiver. *Id* at 14 (citing cases where the privilege holder had a reasonable subjective and objective belief that he took affirmative steps to maintain confidentiality of privileged communications sufficed not to waive privilege). *Id.* at 14-15.

Finally, Dahlberg contends that the *Poulis* factors demonstrate that dismissal and an award of fees is the only remedy in this situation *Id.* at 17. He argues that Willett is personally responsible for the decision to access and view the privileged emails; the prejudice to him is incalculable and incurable, as the emails go directly to her claims in this case; her actions were done willfully and in bad faith and she has used one of those stolen emails in this action; and dismissal and monetary sanctions are the only permissible remedies because the knowledge Willett gained from viewing hundreds of privileged emails cannot be purged and there is no other way to protect Dahlberg from Willett's malevolence. *Id.* at 17-18. He cites numerous cases where courts dismissed cases in similar situations. *Id.* at 18-19 (citing, inter alia, *Xyngular Corp.,* 200 F. Supp. 3d at 1315, *Shawe v. Elting*, 169 A.D.3d 601 (N.Y. App. Div.

2019), and *Perna v. EDS Corp.*, 916 F. Supp. 388 (D.N.J. 1995), where courts punished "scandalous behavior" that necessitated discipline, concluding that money could not cure the improper acts). Dahlberg posits that "it is likely" that Willett also reviewed emails between his current counsel (in this case) and Dahlberg, such that dismissal is a proper remedy. *Id.*

In her post-hearing brief, Willett counters that Dahlberg voluntarily abandoned the device at issue, extinguishing any reasonable expectation of confidentiality and waiving attorney-client privilege; he failed to prove that Two-Factor Authentication was enabled and did not provide evidence of any unauthorized account access; and, even accepting Dahlberg's narrative, no evidence supports the sanctions he seeks. Dkt. No. 120 at 2. Specifically, Willett asserts that, after Dahlberg moved out and picked up his belongings, he "left behind the phone"—paid for by Willett and active on the family cellular plan—which was protected only by the shared family passcode. *Id.* at 3. The phone was connected to an Apple account in Dahlberg's name that the family shared, which makes the case for abandonment of "all privileged communications left on the device." *Id.* According to Willett, after the son found the phone, unlocked it and brought it to her, she thought it was Dalberg's; he had not changed the passcode, reset it or clear it, given the son's ability to access it. *Id.* at 3-4. Willett's "curiosity and fear drew her to view the email application on the phone," which opened when she clicked it, and she began looking for anything that could "haunt" her, based on Dahlberg's threats concerning her mental health, professional reputation and livelihood. *Id.* at 4. She scrolled to when the divorce began and found the 10/26/22 email, printed it, and handed it to her attorney. She viewed emails on the phone between July and August 2023; she believed

Dahlberg changed the password to his email account in August 2023 because new emails stopped appearing. *Id.* at 5. She faulted Dahlberg for not calling an expert to testify about his phone setup, given the sanction of dismissal he was seeking.  Although Willett testified that the permission Dahlberg had given her to access his device probably no longer stood considering their separation, "the only reliable and relevant evidence" is her testimony that she reviewed emails on a "visible unlocked email account stored on a phone that was left in her house and that she paid for that was registered on her phone plan." *Id.* at 6.

Willett also contends that, by the time she accessed the emails, the privilege had been waived because Dahlberg failed to take reasonable precautions against disclosure. *Id.* She again refers to the shared Apple ID, not changing the passcode or resetting the device and never reclaiming it after he left the home. *Id.* at 8, 11. She cites cases where courts held a party forfeited confidentiality in leaving confidential communications unprotected and easily accessible. *Id.* at 7-8. Dahlberg left his confidential information exposed on his device protected only by a passcode shared with Willett and the children, until August 13, 2023 when Willett removed the "shared phone number" from the account. *Id.* at 9-10. Because there was no allegation—"until after litigation ensued"—that Willett accessed Dahlberg's email through hacking, password manipulation, or improper methods, the ends of justice would not support relieving Dahlberg of the consequences of his conduct. Penalizing Willett would invert the purpose of privilege and the sanctions doctrine. *Id.* at 11-12. Dismissal is also unwarranted: a proportional remedy would be to preclude Willett from using the 10/26/22 email that she voluntarily disclosed. *Id.* at 13.

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 18

Dahlberg's request to review or compel disclosure of Willett's privileged communications with her attorney bears no relationship to the issue before the Court. The crime-fraud exception is not satisfied, as the emails Willett saw predated this case and related solely to the parties' divorce and domestic violence matters. There is no evidence Willett discussed her accessing the emails with her counsel or sought guidance to commit a crime. Her invocation of the Fifth Amendment was limited to an "unrelated bank issue" and cannot justify piercing her attorney-client privilege. *Id.* at 13-14. *Poulis* requires proportionality and actual evidence; if any sanction is considered, the proper course would be in camera review of the emails Dahlberg claims were accessed to see how Willett's review caused him prejudice. *Id.* at 15-16.

DISCUSSION

## I.     Magistrate Judge Jurisdiction

In his motion for sanctions, Dahlberg seeks dismissal of Willett's complaint as well as a number of other sanctions, including attorney's fees. Dkt. No. 38. If the Court had concluded that dismissal was warranted, such a result would clearly require submission of a report and recommendation to the district judge because that is a dispositive motion, and the parties have not consented to the jurisdiction of the magistrate judge. Fed. R. Civ. P. 72(b). The question arises as to whether this Court has jurisdiction to issue an order, or whether it

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 19

should issue a report & recommendation, if it concludes—as it does below—that dismissal

is not warranted, but that sanctions under the Court's inherent powers are.[2]

The Third Circuit has not opined on this issue.[3] Some district and circuit courts have

noted that the sanctions issue is unresolved. *Cf. Eldredge v. EDCare Mgmt., Inc.*, No. 13-cv-

61373, 2015 WL 13666059, at *2 (S.D. Fla. July 30, 2015), *aff'd*, 766 F. App'x 901 (11th Cir.

2019) ("In the Eleventh Circuit, it is unresolved whether an Article I judge may issue a final

order on a motion for sanctions under 28 U.S.C. § 1927. *See In re Walker*, 532 F.3d 1304, 1309

---

[2] In *Webasto Thermo & Comfort N. Am., Inc. v. BesTop, Inc.*, No. 16-cv-13456, 2018 WL 5098784 (E.D. Mich. Oct. 19, 2018), a district judge addressed objections to an R&R and adopted a magistrate judge's recommendation for sanctions. The court observed that "[t]here appears to be a split of authority" on whether "the sanction chosen by the magistrate judge, rather than the sanction sought by the moving party, governs the magistrate judge's authority over the motion." *Id.* at *3 (citation modified). The district judge concluded that although the magistrate judge did not award a sanction that was dispositive of a claim or defense, the plaintiff had ultimately sought such a sanction. *Id.* (citing *Beard v. City of Southfield*, No. 14-cv-13465, 2016 WL 6518490, at *1 (E.D. Mich. Nov. 3, 2016) (observing that magistrate judge was required to proceed by R&R where defendants' motion requested dismissal, even though magistrate judge denied the request for dismissal)). Also noting the split in authority as to whether a magistrate judge could issue sanctions under a court's inherent authority, the *Webasto Thermo* court determined that the better course was to proceed by R&R, as the magistrate judge had done.

[3] In *Wei v. Pennsylvania*, No. 1:11-cv-688, 2016 WL 11826172, at *1–3 (M.D. Pa. Jan. 27, 2016), *report and recommendation adopted*, 2016 WL 11826255 (M.D. Pa. Feb. 24, 2016), a magistrate judge denied the plaintiff's motion for sanctions under the court's inherent authority, concluding that plaintiff had not shown that the defendants committed fraud or acted in bad faith during the course of the litigation. On appeal, the plaintiff argued, inter alia, that because his motion for sanctions was a dispositive motion and magistrate judges did not have inherent authority to issue sanctions, instead of issuing an order on his motion for sanctions, the magistrate judge should have addressed the motion for sanctions in an R&R. He urged the district judge to apply a de novo standard of review. The district judge opined that the magistrate judge's order "resolved a non-dispositive sanctions motion, therefore the Magistrate Judge was not required to issue a Report and Recommendation" without further explanation (citing Fed. R. Civ. P. 72(a) and Local Rule 72.2, which address nondispositive matters).

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 20

(11th Cir. 2008) ("We need not decide whether the [Article I judge] had the authority to impose sanctions under [28 U.S.C. § 1927] because the court did not abuse its discretion when it awarded sanctions under its inherent powers."); *accord In re Volpert*, 110 F.3d 494, 499–500 (7th Cir. 1997))"; *Kiobel v. Millson*, 592 F.3d 78 (2d Cir. 2010) (three separate opinions discussing in dicta whether magistrate judges have authority to order Rule 11 sanctions with one judge concluding that they do, one judge concluding that they do not, and one judge calling on Congress or the Supreme Court to decide the issue). A circuit split has developed on the issue of whether magistrate judges may issue orders imposing monetary sanctions under their inherent authority (or Rule 11 or 28 U.S.C. § 1927) or whether they must recommend such sanctions in an R&R. *Compare Reddick v. White*, 456 F. App'x 191, 193-94 (4th Cir. 2011) (discussing a district court's inherent authority to sanction bad-faith conduct as recognized in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991), observing that "[a] motion for sanctions under the district court's 'inherent' power is not a pretrial matter under § 636 [(b)(1)(A)]," and concluding that when such inherent authority is exercised by a magistrate judge, the ruling requires the magistrate judge to issue an R&R with *de novo* review by the district court), and *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 869 (7th Cir. 1996) (motions for sanctions, whether brought pre– or post-trial, are dispositive matters that must be referred to magistrate judge under 28 U.S.C. § 636(b)(1)(B) or (b)(3), and rejecting *Maisonville v. F2 Am., Inc.*, 902 F.2d 746 (9th Cir. 1990) holding that sanctions requested prior to a decision on merits could be referred to a magistrate judge under § 636(b)(1)(A)); *with Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F. Supp. 2d 976,

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 21

985-87 (N.D. Cal. 2012) (following *Maisonville,* expressly declining to follow *Reddick*, and

reasoning that "[n]othing in *Chambers* indicates that inherent powers are limited to Article

III courts," and reviewing the magistrate judge's order issuing sanctions pursuant to the

court's "inherent power" for clear error);

Accordingly, given that Dahlberg has sought dismissal, a dispositive remedy, and

given the conflicting authority on the issue, the Court concludes, out of an abundance of

caution, that the better and more prudent course is to proceed by a report &

recommendation on the Motion for Sanctions.

## II.    Legal Standard: Attorney Client Privilege & Waiver

In a diversity action, Virgin Islands law governs the applicability of attorney-client

privilege. *Petro Indus. Sols., LLC v. Island Project & Operating Servs., LLC*, No. 21-cv-312, 2023

WL 3864587, at *3 (D.V.I. June 7, 2023). Section 852 of Title 5 of the Virgin Islands Code sets

out the elements of attorney-client privilege in the Territory.

> In order for the attorney-client privilege to attach to a communication, it must
> be (1) a communication (2) made between privileged persons (3) in
> confidence (4) for the purpose of obtaining or providing legal assistance for
> the client. In addition, [t]he attorney-client privilege is personal, belongs solely
> to the client, and generally cannot be asserted by anyone other than the client.
> The burden of showing the existence of circumstances justifying the
> recognition of the attorney-client privilege rests with the party asserting the
> privilege.

*Samuel v. Century Hill, Inc.,* No. ST-18-cv-441, 2020 WL 13252118, at *3 (V.I. Super. Feb. 25,

2020) (citation modified). The "burden of showing the existence of circumstances justifying

the application of the attorney-client privilege rests with the party asserting the privilege."

*Petro,* 2023 WL 3864587, at *3.

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 22

Section 852 also sets out nine exceptions to the privilege. The privilege can be lost,

inter alia, if "the services of the lawyer were sought or obtained to enable or aid anyone to

commit or plan to commit what the client knew or reasonably should have known to be a

crime or fraud," 5 V.I.C. § 852(d)(1), and "if the client waives confidentiality as to one or more

issues such as by disclosing privileged communications to a third party or the client or the

attorney breaches a duty that is owed to each other." 5 V.I.C. § 852(d)(9). Waiver can either

be voluntary or inadvertent. Section 861 provides, in pertinent part, that waiver occurs when

the holder of the privilege "voluntarily discloses or consents to disclosure of any significant

part of the privileged matter." 5 V.I.C. § 861. Inadvertent disclosure is addressed by V.I. R.

Evid. 502(d). That Rule provides:

> **(d) Inadvertent Disclosure.** When made in a Virgin Islands or federal
> proceeding . . . , a disclosure does not operate as a waiver of privilege or work
> product protections in a Virgin Islands, federal or state proceeding if:
>> (1) the disclosure is inadvertent;
>> (2) the holder of the privilege or protection took reasonable steps to
>> prevent disclosure; and
>> (3) the holder promptly took reasonable steps to rectify the error,
>> including (if applicable) following Virgin Islands Rule of Civil
>> Procedure 26(b)(5)(B).

V.I. R. Evid. 502(d); *see Fenster v. Dechabert*, No. SX-16-CV-343, 2017 WL 4969896, at *13

(V.I. Super. Sept. 27, 2017). In *Richards v. Legislature of V.I.*, No. 06-cv-237, 2009 WL 174959

(D.V.I. Jan. 9, 2009), the court described when an inadvertent disclosure did not constitute a

waiver of the privilege:

> In determining whether a document has lost its privilege through inadvertent
> disclosure, the following factors may be considered: (1) the reasonableness of
> the precautions to prevent disclosure in view of the extent of the document
> production; (2) the number of inadvertent disclosures; (3) the extent of the

> disclosures; (4) any delay and measure taken to rectify the disclosure; and (5) whether the overriding interest of justice would or would not be served by relieving a party of its error.

*Id.* at *3. The Supreme Court of the Virgin Islands has not opined on which party has the burden to show waiver. Only one case has addressed the issue: *Nicholas v. Wyndham Int'l, Inc.*, No. 01-cv-147, 2003 WL 23198845 (D.V.I. May 19, 2003). There, Magistrate Judge Resnick held that the burden fell on the party seeing to show waiver of the work product and attorney client privilege. *Id.* at *4. Although the district court vacated the order, 224 F.R.D. 370, 371-72 (D.V.I. 2004), it did not address the burden issue but held that the work product doctrine did not protect the contested documents in that case. However, other District Courts in the Third Circuit hold that the burden lies with the party seeking to show waiver of the attorney-client privilege, *see, e.g., Allen v. Banner Life Ins. Co.,* 340 F.R.D. 232, 237 (D.N.J. 2022), *Rhoads Indus. Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 216, 223 (E.D. Pa. 2008), while some courts outside the Circuit have held that the burden lies with the party asserting privilege to show that it has not been waived, *see, e.g., In re Grand Jury Subpoena,* 341 F.3d 331, 335 (4th Cir. 2003), *Oakley v. MSG Networks, Inc.,* No. 17-cv-6903, 2025 WL 307413, at *1 (S.D.N.Y. Jan. 27, 2025). The Court does not need to resolve this matter here because it concludes that the issues of disclosure and waiver are inapplicable.

## III.    Application

Willett does not dispute, nor could she reasonably do so, that the October 26, 2022 email from Dahlberg to his then-counsel in the divorce/custody/domestic violence proceedings in Superior Court—emblazoned with ***Attorney Client Privilege*** at the

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 24

top—was a communication made between privileged persons in confidence for the purpose of obtaining or providing legal assistance to the client. That communication satisfied all of the requirements under 5 V.I.C. § 852 and was protected by the attorney-client privilege.

The crux of Willett's argument is that Dahlberg waived his attorney-client privilege regarding that email (and others to and from Dahlberg and his attorney that Willett admittedly accessed) through inadvertent disclosure because Dahlberg abandoned his cellphone which had no password protection or Two-Factor Authentication on an account that Willett was paying for. Dkt. No. 120 at 2, 3. Dahlberg counters that there was no disclosure at all, voluntary or inadvertent, and therefore there was no waiver; but even if there was disclosure, he enabled Two-Factor Authentication to protect his email account, but Willett was able to hack the phone or bypass that protection to gain access to his emails and his bank account. Dkt. No. 115 at 6, 13-14.

After considering the testimony at the hearing and the related filings, the Court rejects Willett's approach that the sanctions motion should be resolved by focusing on *Dahlberg's* alleged *disclosure* of confidential emails and his concomitant waiver of the attorney-client privilege. Rather, the facts point to *deliberate, improper, and unauthorized access* to Dahlberg's privileged emails on the part of *Willett* with no disclosure, either voluntary or inadvertent, on Dahlberg's part.

Black's Law Dictionary defines "disclosure" as "the act or process of making known something that was previously unknown; a revelation of facts." *Black's Law Dictionary* (12th ed. 2024). *Webster's Ninth New Collegiate Dictionary*, 360 (Merriam-Webster, Inc. 1988)

similarly defines "disclosure" as "the act or an instance of disclosing; exposure," with "disclose" meaning "to expose to view, to make known or public." These definitions, which would apply to both voluntary and inadvertent disclosure, explicitly presume some affirmative act of disclosure on the part of a person that reveals information; *see also Black's Law Dictionary* (12th ed. 2024) (defining "inadvertent disclosure" as "[t]he accidental revelation of confidential information, as by sending it to a wrong email address or by negligently allowing another person to overhear a conversation."). The requirement of some affirmative act on the part of the person revealing the information comports with the text of 5 V.I.C. §§ 852, 861, and V.I. R. Evid. 502, where the party possessing the privilege does something, either on purpose or unintentionally, to reveal the confidential communication.

Virgin Islands case law follows that authority. *See, e.g., Arvidson v. Buchar*, ST-2016-cv-410, 2023 WL 5167329, at *2, *6 (V.I. Super. Aug. 8, 2023) (discussing waiver of attorney client privilege where privilege holder asserted claim or defense that put the attorney's advice at issue; privilege not waived absent explicit waiver or disclosure); *Richards*, 2009 WL 174959, at *3 (attorney-client privilege concerning letter and memorandum inadvertently disclosed in discovery was waived); *Addie v. Kjaer*, No. 04-cv-135, 2008 WL 5632261, at *3 (D.V.I. Jan. 10, 2008) (finding waiver when client voluntarily disclosed privileged communications to third party). Case law from this circuit reiterates that waiver of a privilege requires an affirmative act. *Regional Emps' Assur. Leagues Voluntary Emps' Beneficiary Ass'n Trust v. Castellano*, No. 03-cv-6903, 2007 WL 2084179, at *3 (E.D. Pa. July 13, 2007) ("The attorney client privilege is waived when a litigant places information

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 26

protected by it in issue through some affirmative act for his own benefit, and to allow the

privilege against disclosure of such information would be manifestly unfair to the opposing

party.") (quoting case applying state law of privilege); *McCrink v. Peoples Benefit Life Ins. Co.*,

No. 04-cv-1068, 2004 WL 2743420, at *4 (E.D. Pa. Nov. 29, 2004) ("Like the standard for

waiving the attorney-client privilege, this requires an affirmative step by the client.");

*Mantakounis v. Aetna Cas. & Sur. Co*., No. 98-cv-4392, 1999 WL 391481, at *1 (E.D. Pa. May

24, 1999) ("The client may waive the privilege by placing counsel's advice in issue, but this

waiver must result from the client's conscious and affirmative act.").

      Neither Dahlberg nor Attorney Moolenaar engaged in any affirmative act—whether

voluntary or inadvertent—to disclose the 10/26/22 email (or other unspecified emails

between the two that Willett read) that would have waived the attorney-client privilege.

There is no evidence that they shared the emails with anyone, voluntarily or by mistake.

Dahlberg did not print out the email and leave it lying around, *see In re Marriage of

Kurotsuchi*, Nos. 11-0638, 11-2319, 2013 WL 791237, at *10 (Ill. App. 1st Mar. 1, 2013)

("There is some argument to be made that, had [the wife] left a printed copy of the email

where [the husband] could find it or had left it showing on the shared computer screen

where [the husband] could read it, then she waived confidentiality attached to the emails.")

(citing *Parnes v. Parnes*, 80 A.D.3d 948 (N.Y. App. Div. 2011)).

      The evidence is, at the very least, disputed that Dahlberg "abandoned" his phone at

the house once he left.[4] But even under Willett's version of events, the phone had been lost in the house for ten months after Dahlberg's departure (which is not equivalent to abandonment). In order for Willett to have accessed Dahlberg's emails, the phone had to be (1) found; (2) powered on; (3) charged; (4) unlocked; and (5) the emails accessed. Whether the phone was protected by a passcode and whether the email account was protected by a password and/or Two-Factor Authentication are highly disputed facts. But nothing in the facts presented suggests any type of disclosure and/or waiver on Dahlberg's part. A particularly salient point in this regard is the fact that Dahlberg did not even know that Willett had accessed, read, and copied his emails until Willett's attorney placed the 10/26/22 email on the docket in this case on April 10, 2025, Dkt. No. 37; Dkt. No. 113 at 115. This points to unauthorized, surreptitious access rather than disclosure and waiver.

As stated in Willett's brief, "curiosity and fear drew her to view the email application on the phone." Dkt. No. 120 at 4 (citing Dkt. No. 113 at 68). In other words, the affirmative act of accessing the emails to view their contents was *Willett's* act. As a result, the waiver statute, 5 V.I.C. § 852(d), the voluntary disclosure statute, 5 V.I.C. 861, V.I. Rule of Evidence 502(d) discussing inadvertent disclosure, and V.I. case law addressing voluntary and

---

[4] In *In re Asbestos, Silica and Catalyst Dust Claims IV*, No. SX-22-mc-053, 2025 WL 2178302 at *6 (V.I. Super. June 11, 2025), the Court cited *Ubiles v. People of the V.I.*, 66 V.I. 572, 586 (V.I. 2017), for the proposition that "[a] waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." Thus, it is the *privilege* that must be intentionally abandoned, not the *device* on which privileged communications may be found. Not only did Dahlberg not intentionally abandon the attorney-client privilege, but the facts show that Willett did not give him his phone when he went to retrieve his belongings.

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 28

inadvertent disclosure are simply inapposite.[5] Thus, the Court answers the second question

it asked the parties to address, post-hearing—whether the attorney-client privilege has been

waived at all—in the negative. That response obviates an examination of the first question it

asked the parties to address—how Willett gained access to those emails—because that

question was premised on whether Dahlberg had waived his attorney-client privilege by

failing to take reasonable precautions to prevent *disclosure* of those emails.[6] *See Richards*,

---

[5] For example, the inadvertent disclosure cases cited by Willett all involve some affirmative act of disclosure of documents protected by the attorney-client privilege and a failure by the privilege holder to take reasonable precautions against disclosure. *In Parnes v. Parnes*, a divorce case relied upon by Willett, Dkt. No. 120 at 7-8, the plaintiff discovered one page of defendant's multi-paged email to defendant's attorney on the defendant's desk in the marital home. While searching for the other pages, plaintiff discovered the username and password for the defendant's email account, gained access to the account, printed emails between defendant and his attorney, and turned them over to her counsel. The court determined that the defendant had waived his attorney-client privilege as to the one page of the email letter he had left on the desk and had failed to prove that he took reasonable steps to maintain confidentiality of that page. However, leaving a note on the desk containing his email's username and password, although careless, "did not constitute a waiver of the privilege, as defendant maintained a reasonable expectation that no one would find the note and enter that information into the computer in a deliberate attempt to open, read and print his password-protected documents." 80 A.D.3d at 951. Out of all of the cases cited by Willett, this is closest in facts to the circumstances here (if the Court were to accept her position that Dahlberg never enabled Two-Factor Authentication). The conduct here is not, as Willett argues, "the functional equivalent of leaving a file folder labeled Attorney-Client Communications in a marital kitchen drawer and claiming privilege when a spouse discovers it later"—which would also be contrary to the holding in *Parnes.* Dkt. No. 120 at 8.

[6] Even if the Court were to consider how Willett gained access to Dahlberg's emails, the answer to that question would depend on the Court's resolution of a highly-contested factual dispute: whether the Court believes Dahlberg's testimony that he instituted reasonable precautions against disclosure (Two-Factor Authentication on his email account) and Willett was able to bypass those efforts, or whether the Court believes Willett's testimony that she was able to access the email account because she knew the password to unlock the phone, there was no Two-Factor Authentication on the email account, and she could access the

emails from the phone's opening screen. In the Court's view, Dahlberg's testimony was generally credible, while Willett's was not, which leads to the conclusion that Dahlberg did institute reasonable precautions against disclosure. The Court's credibility assessment is based on some significant inconsistencies in Willett's testimony. First, she could not recall whether she printed out other of Dahlberg's emails in addition to the 10/26/22 email, Dkt. No. 113 at 29, but later admitted she printed out a number of them, even recalling what subject matter they generally pertained to (financial information), *id*. at 71. She asserted that she could not recall if she destroyed the other emails, *id*. at 31, but thought she must have done so because they were not in her home—which strikes the Court as completely incredible for a person who had accessed confidential attorney-client communications of her adversary in highly contentious court proceedings and where she kept the 10/26/22 email for over two-and-one-half years and gave it to Attorney Rohn in early 2025 to use for a perceived litigation advantage in this case. But the most significant and most telling fact that tips the scales against Willett's credibility was the testimony (or lack thereof) surrounding the access to Dahlberg's Truist Bank account by "Katie Dahlberg" in January 2024 as shown in Exhibit 13. Willett repeatedly pleaded the protection of the Fifth Amendment concerning her alleged access to that account that Dahlberg had established *after* he had left the house. Dkt. No. 113 at 84-86. She did not answer questions as to whether she withdrew $18,080 from the account, whether she accessed the account and withdrew the money through the cellphone at issue, and whether she was a signatory on the account. *Id,* Case law provides that the privilege against self-incrimination may be raised in civil proceedings; however, "reliance on the Fifth Amendment in civil cases may give rise to an adverse inference against the party claiming its benefits." *S.E.C. v. Graystone Nash, Inc.,* 25 F.3d 187, 190 (3d Cir. 1994). Such an inference "is only appropriate where there is sufficient independent evidence besides the mere invocation of the Fifth Amendment privilege upon which to base the negative inference." *Barasky v. Dent*, No. 21-cv-4021, 2025 WL 3678888, at *8 (M.D. Pa. Dec. 18, 2025) (citation modified). Exhibit 13 provides "sufficient independent evidence" upon which to base the negative inference. *Id.* Thus, given adverse inferences that she accessed the account with the cellphone at issue and withdrew the money from the account, that is sufficient, in this Court's view, to conclude that her version of how she accessed Dahlberg's emails is not credible. *Cf. Lambert v. Blackwell*, 387 F.3d 210, 256 (3d Cir. 2004) (discussing "falsus in uno, falsus in omnibus" jury charge that provides: "If you find that any witness testified falsely about any material fact, you may disregard all of [her] testimony, or you may accept such parts of it as you wish to accept and exclude such parts of it as you wish to exclude."). But *even if* Dahlberg protected his accounts with Two-Factor Authentication— which would have sufficed for reasonable precautions—Willett's access to the Truist account showed that she was able to bypass such precautions to access that account—and by extension, she did so with Dahlberg's email account. This evidence demonstrates that Willett was stopping at nothing to gain a litigation advantage over Dahlberg. This goes to bad faith, discussed below.

2009 WL 174959 at *3. Since Willett accessed privileged emails without permission, the Court turns to the third question it asked the parties to consider—the appropriate remedy for Willett's misconduct.

## IV.    Remedy

### A.  Legal Standard

Dahlberg seeks the ultimate sanction of dismissal under the Court's inherent powers because Willett obtained privileged emails regarding the very claims before the Court and nothing less than dismissal can protect litigants from such egregious behavior. Dkt. No. 115.[7]

---

[7] In his initial motion for sanctions, Dahlberg argued that the crime-fraud exception to attorney client privilege applied to Willett's communications with Attorney Rohn, as they were made in furtherance of a crime, fraud, or other misconduct. Dkt. No. 39 at 3-8. He argued that the Crime Fraud & Abuse Act (CFAA), the Stored Communications Act (SCA), and Virgin Islands criminal law were implicated. *Id.* In his post-hearing brief, Dahlberg did not argue that the hearing testimony supported this approach, and he does not appear to be pursuing disclosure of emails between Willett and Attorney Rohn based on the crime-fraud exception. Rather, he argues that the Court should exercise its inherent authority to sanction Willett for her egregious conduct in accessing his privileged emails by dismissing the complaint and imposing monetary sanctions. Dkt. No. 115 at 16-20. To the extent that Dahlberg has not abandoned his crime-fraud exception argument, the Court rejects it as a basis to impose sanctions. No evidence was adduced showing that Attorney Rohn communicated with Willett to further any alleged crime or fraud in which Willett may have engaged by accessing Dahlberg's emails. Importantly, that access apparently occurred even before Attorney Rohn represented Willett. Moreover, at least one element of the CFAA was not satisfied because Dahlberg did not allege at least $5,000 in damages relating to reasonable costs to investigate and restore a computer system or that he lost revenue when the system was rendered unavailable during a one-year period, 18 U.S.C. § 1030(c)(4)(A)(i). Under the SCA, a cellphone is not the kind of electronic communications storage system contemplated for violation of the statute, 18 U.S.C. § 2701(a)(1). *See Sartori v. Schrodt*, 424 F. Supp. 3d 1121, 1127-35 (N.D. Fla. 2019). Further, Dahlberg's summary argument under the V.I. Computer Crime Statute, 14 V.I.C. § 462, Dkt. No. 39 at 7, did not sufficiently argue that access was for a fraudulent or illegal purpose.

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 31

Willett counters that the Court should engage in an in-camera review of the emails Dahlberg claims were accessed to evaluate the prejudice Dahlberg contends he has experienced would be appropriate. Dkt. No. 120 at 16-17.

"It is well-established that courts have the power to impose sanctions on both litigants and attorneys to regulate their docket, to promote judicial efficiency, and to deter abuse of the judicial process." *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 505 (3d Cir. 1991) (citation omitted). "Because of their potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). "A court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Id.* (citation modified). The Third Circuit has "delineated the analytical progression a court must take in imposing sanctions under its inherent powers." *Computer Power Inc. v. Myers Nu/Art Elec. Prods. Inc.*, No. 01-cv-0451, 2002 WL 84057, at *2 (D.N.J. Jan. 18, 2022) (citing *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65 (3d Cir. 1994)). "First, the court must explain why the conduct in question warrants a sanction." *Id.* "Second, the court then must consider the range of available sanctions and explain why it has chosen any specific sanction from the range of identified alternatives." *Id.* "[A] court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists." *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995); *see also Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 109 (3d Cir. 1999) ("When the Rules or pertinent statutes are up to the task, they should be used. When they are not, a trial

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 32

court may turn to its inherent sanctioning power, but should exercise that power with caution.") (citation modified).

Although the Court has "inherent authority to control its docket" and may dismiss a case pursuant to that authority or as provided under the Federal Rules of Civil Procedure, "'dismissals with prejudice . . . are drastic sanctions[.]'" *Knoll v. City of Allentown,* 707 F.3d 406, 409 (3d Cir. 2013) (quoting *Poulis,* 747 F.2d 863). The Court must consider the six factors enumerated in *Poulis* before dismissing a case pursuant to its inherent authority. *Id.* The *Poulis* factors are:

> (1) the extent of the *party's* personal *responsibility;* (2) the *prejudice* to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith;* (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative sanctions;* and (6) the *meritoriousness* of the claim or defense.

*Poulis,* 747 F.2d at 868. No single factor is outcome-determinative; dismissal may be appropriate even if some of the factors are not met. *See Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992); *Hicks v. Feeney*, 850 F.2d 152, 156 (3d Cir. 1988).

Numerous circuit courts have held that improper access to privileged emails can be sanctioned under a court's inherent authority. *See, e.g., Xyngular v. Schenkel*, 890 F.3d 868, 872-73 (10th Cir. 2018) (applying that circuit's equivalent of the *Poulis* factors and holding that the party's misconduct—including prelitigation acts of misappropriating documents, used in anticipation of the instant litigation and during the litigation itself—was sanctionable bad-faith conduct that abused the judicial process); *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.,* 561 F.3d 1298, 1307 (11th Cir. 2009) (affirming a sanction of dismissal for a

party whose "ongoing ability to intercept confidential and privileged emails" both before and during litigation would make adjudication of his claims untenable); *Jackson v. Microsoft Corp.,* 78 F. App'x 588, 589 (9th Cir. 2003) (affirming a terminating sanction for a party's prelitigation receipt of privileged information because the defendant "would be unfairly prejudiced were the case to go forward").

### B. Application

The first *Poulis* factor—the extent of the party's responsibility—weighs in favor of dismissal. Although Willett is represented by counsel, the record before the Court does not indicate that Willett's counsel bore personal responsibility for Willett's unauthorized access to Dahlberg's privileged communications. In fact, that access occurred and may even have been completed before Attorney Rohn became involved as Willett's counsel, given that Willett testified that Attorney Otto was her lawyer in July-August 2023 when she at least initially accessed Dahlberg's confidential emails. Dkt. No. 113 at 95. As evidenced by her testimony, once Willett ascertained that she had Dahlberg's cellphone in her possession, she made the deliberate choice to access his confidential emails to and from his attorney at the same time she was embroiled in a number of domestic legal actions against him and accessed the emails repeatedly. *Id*. at 16, 49-50, 69-72,156-59, 171-72.  It is Willett alone who bears full responsibility for her actions.

The second *Poulis* factor—prejudice to the opposing party—also weighs in favor of dismissal. Generally, prejudice includes "the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or

costs imposed on the opposing party." *Adams v. Trustees of N.J. Brewery Emps' Pension Trust Fund,* 29 F.3d 863, 874 (3d Cir. 1994) (citation modified). But prejudice is not limited to "irremediable" harm. *Id.* It also includes "the burden imposed by impeding a party's ability to prepare effectively a full and complete trial strategy." *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 222 (3d Cir. 2003). "Evidence of prejudice to an adversary would bear substantial weight in support of a dismissal." *Adams*, 29 F.3d at 874 (citation modified).

The prejudice accruing to Dahlberg from Willett's unauthorized access to his privileged communications with his attorney comports with the latter definition. Willett admitted that she accessed his email account numerous times, Dkt. No. 113 at 25; she specifically looked for emails between Dahlberg and Attorney Moolenaar, *id.* at 70; she read numerous (if not all of those) emails and copied a number of them, *id.* at 29. According to Dahlberg, his email account contained hundreds of exchanges with his attorney. *Id.* at 212. Although the accessed email exchanges ostensibly took place in 2023 before Willett initiated the instant litigation in August 2024, the alleged domestic violence incident that served as the foundation for the instant complaint was then being litigated in Superior Court, making Dahlberg's exchanges with his then-counsel relevant to the instant litigation.

Willett's extensive monitoring of privileged emails provided her a front row seat, if not a complete reveal, of Dahlberg's counsel's strategy in the Superior Court litigation. Willett then provided her attorney in *this* litigation with a copy of the 10/26/22 email (over two and one-half years since she purportedly copied it) to obtain a litigation advantage in this case. Dkt. No. 37. Without specifically knowing which of Dahlberg's privileged emails Willett read,

Dahlberg cannot precisely gauge the amount of prejudice he faces. Nor can the Court specifically gauge such prejudice. But such a precise evaluation of prejudice is not required. It is enough to determine from the record that Willett has gained an improper advantage from that inside knowledge which will impede Dahlberg and his counsel from effectively preparing "a full and complete trial strategy," thereby prejudicing him. *Ware,* 322 F.3d at 222. This factor thus weighs in favor of dismissal.

The third *Poulis* factor—a history of dilatoriness—is not relevant to this analysis.

The fourth *Poulis* factor—whether the conduct of the party or the attorney was willful or in bad faith—weighs heavily in favor of dismissal. Under this factor, the District Court must consider whether the conduct was "the type of willful or contumacious behavior which was characterized as flagrant bad faith." *Adams,* 29 F.3d at 875 (citation modified). Generally, "[w]illfulness involves intentional or self-serving behavior." *Id.; see Browne v. Gov't of Virgin Islands*, No. 18-cv-0003, 2022 WL 4598824, at *4 (D.V.I. Sept. 30, 2022). If the conduct is merely negligent or inadvertent, courts will not deem such conduct "contumacious." *See Poulis,* 747 F.2d at 868–69; *see also Emerson v. Thiel Coll.,* 296 F.3d 184, 191 (3d Cir. 2002) (finding bad faith because the conduct went beyond mere negligence).

As touched upon above, the record contains little evidence concerning the actions of Willett's attorney, Lee Rohn, Esq., who filed Dahlberg's attorney-client privileged email on the record, purportedly believing at face value Willett's explanation that Dahlberg "gave" Willett "access to it." Dkt. No. 39-1 at 2. As problematic as that statement is, it is insufficient

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 36

for the Court to conclude that Attorney Rohn acted in bad faith. In striking contrast, the bad

faith of Willett, as gleaned from the hearing testimony, is exceedingly apparent.

Willett quickly discerned, after being given the cellphone by one of her children, that

it was Dahlberg's phone. Dkt. No. 113 at 155-56, 161. Whether or not Dahlberg had enabled

Two-Factor Authentication on his email account is beside the point because Willett made the

conscious decision to access Dahlberg's email account, open messages and scroll through

them—explicitly looking for emails between Dahlberg and his attorney in the ongoing

litigation—and print out numerous emails. *Id.* at 49-50, 69-71. Willett knew the emails

between Dahlberg and his attorney were confidential and that she did not have permission

to read them. *Id.* at 25-27. She acknowledged that she "probably" no longer had permission

to go through his phone or emails that she allegedly had when they were living together. *Id*.

at 168. She accessed the confidential emails numerous times, *id*. at 171-72, because she was

"curious" as to what they contained, *id.* at 68. She added that she was "looking for anything

that could haunt" her in those emails, *id.* at 69—i.e., a strategy or position that Dahlberg was

discussing with his attorney, in confidence, in the ongoing acrimonious litigation with

Willett—that Willett could attempt to parry to her advantage. And although Willett sought

to justify her invasion of Dahlberg's attorney-client privilege, she also evinced a

consciousness of guilt, as she did not inform her attorney at the time that she was rooting

through Dahlberg's emails, since she "liked to keep her private business private." *Id*. at 34.

"Private" certainly sounds better than "secret" as she was engaged in an intentional

subterfuge of the attorney-client privilege that was completely self-serving. *Adams,* 29 F.3d

at 875. In doing so, she undercut fundamental bases of our legal system—confidentiality of attorney-client communications, where litigants seek resolution of issues by playing on a level playing field where neither side has an unfair advantage. Accordingly, this factor weighs heavily in favor of dismissal.

The fifth *Poulis* factor—the effectiveness of sanctions other than dismissal—is the factor that gives the Court the most pause in determining whether or not to recommend granting that part of Dahlberg's Sanctions Motion that seeks dismissal. The Third Circuit stresses that dismissal is a sanction of last resort and requires courts to explore the effectiveness of lesser sanctions before ordering dismissal. *Poulis*, 747 F.2d at 868; *see United States v. Gilead Scis., Inc.*, No. 17-cv-1183, 2025 WL 2627686, at *19 (E.D. Pa. Sept. 11, 2025) ("The inherent powers of federal courts include the well-acknowledged power to levy sanctions in response to abusive litigation practices. These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. These sanctions include the ultimate sanction of dismissal of the case. At the same time, however, the Third Circuit has a longstanding tradition of favoring decisions on the merits and cases should be decided on the merits barring substantial circumstances in support of the contrary outcome."). In *Browne*, 2022 WL 4598824, at *5, the district court opined that the "Third Circuit has identified a number of alternative sanctions available to a court, including a warning, a formal reprimand, placing the case at the bottom of the calendar, a fine, the imposition of

costs or attorney fees or the preclusion of claims or defenses." *Id*. at \*5 (quoting *Titus v. Mercedes-Benz of N. Am.,* 695 F.2d 746, 759 n.6 (3d Cir. 1982)).

While the Court remains deeply troubled by Willett's behavior, and her counsel's no-questions-asked approach that took Willett's explanation for how she accessed the 10/26/22 email at face value, it is reticent to recommend dismissal. At this point, mainly because the Court cannot assess how much the emails between Attorney Moolenaar and Dahlberg in the prior litigation may have impacted or may impact this litigation—with a caveat set out in Section V, below—the Court believes that assessing reasonable attorney's fees and costs will make the point that such behavior is anathema to our legal system. This sanction will also permit the Court to eventually address the merits of this case. *Gilead Scis., Inc.*, 2025 WL 2627686, at \*19. Thus, this factor weighs against dismissal.

In order to assess the amount of sanctions, the Court will Order Attorney Cattie to submit to the Court the attorney's fees and costs related to the Sanctions Motion. That includes fees and costs related to: (1) the initial motion, filed on April 16, 2025, Dkt. Nos. 38, 39; (2) the reply, Dkt. No. 63; (3) all costs (including airfare, hotel, meals of Mr. Dahlberg) and attorney's fees related to the July 29, 2025 hearing; and (4) the post-hearing brief, Dkt. No. 115. Attorney Cattie shall submit an accounting within ten days from the date of this Order and Report & Recommendation so that the District Judge will have this figure when he addresses the R&R.

Courts assess the sixth *Poulis* factor—whether a plaintiff's claim is meritorious—by applying the standard for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Poulis,*

747 F.2d at 869–70. A claim or defense is "meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense." *Id.* at 870. Discovery in this case is a long way from being completed, given the recent filing of a joint motion to amend the scheduling order. Dkt. No. 132. Most of the litigation so far has concerned protective orders and the motion for sanctions. At this early stage, it is difficult to assess whether Willett's claims or Dahlberg's counterclaims have merit. The Court therefore concludes that this factor is neutral. *Browne,* 2022 WL 4598824, at *5 (quoting, inter alia, *Tutein v. Insite Towers, LLC*, No. 12-cv-00071, 2016 WL 373952, at *5 (D.V.I. Jan. 29, 2016) ("In view of the arguments made in Defendant's previously filed Motion to Dismiss . . . the Court will not prematurely opine on the merits of Plaintiffs' claims. Because the Third Circuit has 'never held that *Poulis*' sixth factor is determinative,' the Court finds that this factor is neutral.")).

## V.      Recommendation and a Warning

In sum, three of the *Poulis* factors weigh in favor of dismissal, one weighs against, one is neutral, and one is inapplicable. Assessing all of these factors, the Court concludes that sanctions are required for Willett's egregious behavior, but that an alternative sanction other than dismissal is warranted here, which will allow this case to be decided on the merits.

However, the Court includes a caveat and warning to Willett and Attorney Rohn. Willett testified that she printed other of Dahlberg's privileged emails he had with Attorney Moolenaar. Dkt. No. 113 at 29. The entire point of her invading the attorney-client privilege was to gain a litigation advantage by having a ring-side seat into Dahlberg's and his

attorney's litigation strategy and his recollection of events. Her lackadaisical response that she must have destroyed those documents because she no longer could find them in her house, *id*. at 29, is utterly unconvincing given the highly charged litigation atmosphere that still exists. Moreover, given the reasoning in this R&R, Attorney Rohn will be unable to use Dahlberg's privileged documents in future litigation in this case, under the misguided presumption that Dahlberg gave Willett such access.

Therefore, the Court warns Willett and Attorney Rohn that if Dahlberg can prove to the Court's satisfaction in any subsequent filing that Willett was using information that could only have come from the improperly accessed emails between Dahlberg and Attorney Moolenaar, the Court will accept a renewed motion for sanctions seeking dismissal, and may consider assessing sanctions against Attorney Rohn. This is the situation Willett brought upon herself by surreptitiously accessing those privileged documents, and Attorney Rohn and Willett have brought upon themselves by filing the attorney-client privileged document in this Court.

## CONCLUSION

Accordingly, for the reasons set forth above, it is hereby **RECOMMENDED** that the Motion for Sanctions, Dkt. No. 38, filed by Defendant Christopher Dahlberg, be **GRANTED IN PART AND DENIED IN PART**. It is **RECOMMENDED** that the Motion be **GRANTED** to the extent that the Court shall impose sanctions in the form of attorney's fees and costs on Plaintiff Katherine Willett related to the litigation expenses surrounding the Sanctions

*Willett v. Dahlberg*
1:24-cv-00024-MEM-EAH
Order and Report & Recommendation
Page 41

Motion, as described *supra*. It is **RECOMMENDED** that the Motion be **DENIED** to the extent that the Defendant seeks dismissal of the Amended Complaint.

It is **ORDERED** that the Defendant submit to the Court an accounting of the attorney's fees and costs expended in litigating the Motion for Sanctions by **January 20, 2026**.

Any objections to this Report and Recommendation must be filed in writing within fourteen (14) days of receipt of this notice, 28 U.S.C. § 636(b)(1), and must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis of such objection." LRCi 72.3. Failure to file objections within the specified time shall bar the aggrieved party from attacking such Report and Recommendation before the assigned District Court Judge. *See, e.g., Thomas v. Arn*, 474 U.S. 140 (1985).

ENTER:

Dated: January 9, 2026                     /s/ Emile A. Henderson III
                                           EMILE A. HENDERSON III
                                           U.S. MAGISTRATE JUDGE